UNION NATIONAL BANK OF LITTLE ROCK, Appellant,

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION, Appellee.

No. 87–2063.

United States Court of Appeals, Eighth Circuit.

Submitted March 17, 1988.

Decided Nov. 2, 1988.

Ruth T. Prokop, Washington, D.C., for appellant.

John P. Gill, Little Rock, Ark., for appellee.

Before HEANEY, Circuit Judge, and FLOYD R. GIBSON and HENLEY, Senior Circuit Judges.

HEANEY, Circuit Judge.

Union National Bank of Little Rock (Union) appeals from an order of the district court granting Federal National Mortgage Association's (FNMA) motion for summary judgment, denying Union's motion for preliminary injunctive relief as moot, and dismissing Union's second amended complaint. We affirm in part, reverse in part, and remand for further proceedings.

## I. BACKGROUND

Union is a federally chartered bank with its principal offices in Little Rock, Arkansas. As part of its banking activities, it engages in the business of originating mortgage loans and selling them to purchasers in a "secondary" market. Typically, after Union sells a mortgage it retains the right to "service" the loan for a fee.[1] FNMA is a federally chartered, but privately owned, mortgage bank with its national headquarters in Washington, D.C. FNMA is a very large participant in the secondary market for mortgage loans, purchasing mortgage loans from hundreds of lending institutions throughout the nation.

On January 3, 1983, FNMA and Union entered into an agreement by which Union became "approved" by FNMA (hereinafter Contract). The Contract consists of a twenty-three page printed form distributed by FNMA to lenders. Pursuant to the Contract, FNMA agrees to conferring upon the lender "approved" status. Such status allows a lender to sell mortgage loans to FNMA and to service loans held by FNMA.[2]

---

1. At oral argument before this Court, Union represented that 17% of its income is derived from loan servicing fees.

2. Pursuant to section III(D) of the Contract, the fact that FNMA enters into the agreement "does not mean that [it] must make a commitment to purchase any mortgage * * * from the lender."

The Contract is supplemented by an FNMA publication called "FNMA's Guides to Lenders" (hereinafter Guides). The Contract provides that the Guides may be amended at the sole discretion of FNMA by furnishing amendments or supplementary matter to the lender. *See* Contract § I(C).[3] The Contract also contains a section in which the lender makes certain warranties concerning any interests it may sell to FNMA.[4] One of the warranties is that mortgage loans sold to FNMA conform to all applicable requirements in the Guides and in the Contract. Contract § IV(A)(1). The Contract provides that in the event of a breach of a warranty, FNMA may require the lender to repurchase the mortgage. Contract § IV(B). Finally, the Contract provides that it may be terminated either by FNMA or by the lender with or without cause.[5]

Apparently, FNMA was not satisfied with Union's performance under the Contract and, by letter dated May 13, 1985, informed Union of its intention to terminate the Contract "for cause." The letter also requested a meeting at which Union and FNMA could attempt to settle disputes concerning Union's performance under the Contract. In June of 1985, Union and FNMA reached an agreement whereby Union would sell its servicing rights to 11,253 mortgage loans owned by FNMA to another approved lender. In addition, FNMA agreed to allow Union to retain servicing rights to approximately one million dollars in mortgage loans and to continue as an FNMA approved lender.[6] As a result of

**3.** The Contract states:

Whenever there is a reference to the Guides in this Contract, it means the Guides as they exist now and as they may be amended or supplemented in writing. We may amend or supplement them, at our sole discretion, by furnishing amendments or supplementary matter to the Lender.

The term "Guides" also includes anything that, in whole or in part, supersedes or is substituted for the Guides.

**4.** The Contract states:

The Lender makes certain warranties to us. These warranties:

* apply to each mortgage sold to us in its entirety;

* apply to each mortgage in which a participation interest is sold to us;

* are made as of the date transfer is made to us;

* continue after the purchase of the mortgage or participation interest;

* continue after payment by us of the purchase price to the Lender; and

* are for our benefit as well as the benefit of our successors and assigns.

Contract § IV.

**5.** With respect to termination by FNMA of "Servicing Arrangements For Wholly–Owned Mortgages," the Contract states:

We may terminate the provisions of this Contract covering the servicing under this Contract of any or all mortgages that we entirely own. This may be done by following the procedures outlined below.

1. *Termination Without Cause.* We may terminate by giving the Lender 30 days notice of the termination, and by paying the Lender a termination fee. This termination fee will be specified in our Guides as we may modify them from time to time.

Our written tender of the termination fee to the Lender, or its successors or assigns, is complete compensation for each mortgage serviced by the Lender that is terminated. Any sums we owe the Lender for servicing prior to the termination date are not included in the termination fee.

2. *Termination With Cause.* We may terminate if the Lender breaches any agreement in this Contract, including, without limitation, any of those listed in Section VIII A. This may be done by giving the Lender notice of termination. If we terminate for breach, we may make it effective immediately, and we will not pay the Lender a termination fee. Furthermore, we will not pay a servicing termination fee if a mortgage or participation interest is repurchased by the Lender because a warranty is untrue.

Contract § IX(C).

**6.** A June 10, 1985, letter memorializing the agreement states:

This letter is in response to your verbal request of June 4, 1985.

It is your intent to transfer most of your current Fannie Mae mortgage servicing portfolio to other Fannie Mae servicers. The proposed transfer is anticipated to take place on July 31, 1985. You wish to retain approximately one million in servicing and to continue as a Fannie Mae approved lender.

We agree to this proposal, provided the servicers selected by you are acceptable to Fannie Mae and the proper fees are paid.

A fee of .10% (10 basis points) shall be paid to Fannie Mae upon transfer of all loans on the Aggregate Exception System. A servicing transfer fee for each MBS pool transferred shall be equal to $500 or .01% (1 basis point)

this agreement, Union subsequently transferred the servicing rights to some $236 million in FNMA owned mortgage loans to FirstSouth Savings and Loan of Pine Bluff, Arkansas (FirstSouth). At the time of the transfer, Union paid FNMA a transfer fee of $216,528.16. Also pursuant to the agreement, Union retained the servicing rights to thirty-three FNMA owned mortgage loans.

After the transfer was completed, FNMA informed Union that eleven of the loans transferred to FirstSouth, with a face value of approximately $493,000, were in default and that Union had breached the warranties Union gave FNMA on those loans. Therefore, FNMA requested that Union repurchase the loans.[7] In response, Union took the position that FNMA's losses on the loans did not result from any breaches of the Contract or warranty provisions. In addition, Union argued that as part of the loan transfer, FirstSouth agreed to assume all responsibility for the loans, including any liability arising out of a breach of a warranty contained in the Contract. In other words, Union argued that by purchasing its FNMA owned loan portfolio, FirstSouth agreed to accept responsibility for good and bad loans, and Union was released from any liability arising out of the transferred loans.[8] Accordingly, Union refused to repurchase the defaulted loans. On January 21, 1987, FNMA sent Union a letter informing it that FNMA considered Union's refusal to repurchase the loans a breach of the Contract and that "unless Union National repurchases the loans by January 31, 1987, we intend to terminate the Contract and Union National's current servicing thereunder *for cause* by the end of February 1987" (emphasis added).

On February 9, 1987, Union filed a petition in the district court requesting an injunction prohibiting FNMA from terminating the Contract. On February 10, 1987, FNMA sent Union a letter informing it that, due to its refusal to repurchase the loans, "the Selling and Servicing Contract between Fannie Mae and Union National Bank is terminated *for cause*, effective immediately" (emphasis added). FNMA then filed a motion to dismiss Union's petition as moot, contending that the termination had already occurred. On February 17, 1987, the district court held an emergency hearing at which the parties agreed to an order staying the effect of the February 10 termination letter pending expedited adjudication of the underlying dispute. *See* District Court Order at 3.

On March 9, 1987, FNMA filed a response to Union's petition and a counterclaim seeking damages for Union's breach of the Contract. In addition, FNMA brought a motion for summary judgment on the issue of its right to terminate the Contract for cause. *See* Designated Record at 56–57 (FNMA Motion For Summary Judgment at paragraphs 1–5). As part of its argument in support of its summary judgment motion FNMA stated:

> Although Fannie Mae terminated this Contract for cause, it clearly could have been terminated at will, yet Union's complaint asks that Fannie Mae even be enjoined from doing that.

Designated Record at 83 (FNMA Brief in Support of Motion for Summary Judgment at 25).

On March 30, 1987, Union responded, arguing that the June 10, 1985, agreement to transfer the servicing rights to the bulk of Union's FNMA owned mortgage loans

---

of the total unpaid principal balances of mortgages transferred, whichever is greater, for commitments issued after December 1, 1982. For all MBS commitments issued prior to December 1, 1982, the transfer fee will be $500 per pool. The fee will be considered payable and earned upon Fannie Mae's approval of the transfer. Any excess yield retained by the servicer will be eliminated.
Please keep us informed of your progress in transferring this servicing. Your cooperation will be appreciated.

7. In its brief, Union contends that FNMA first requested that FirstSouth repurchase the transferred loans but that the request proved fruitless because FirstSouth had gone into receivership. *See* Brief of Appellant at 6.

8. In contrast, Union does not contend it is relieved of liability on the loans it retained. Moreover, FNMA does not claim that Union's performance with respect to the retained loans constituted a material breach of the Contract or the warranties contained therein.

worked a modification of the Contract. In essence, Union argued that in exchange for transferring the bulk of its FNMA owned loan portfolio to FirstSouth, FNMA agreed to allow Union to retain approximately one million dollars in FNMA loans, and hence remain an FNMA approved lender until such time as Union's servicing of the retained loans gave FNMA cause to terminate the contract or until the last of the loans had been repaid.

In support of its assertion, Union introduced the affidavits of two of its employees who were involved in the June 1985 transfer negotiations. In the first, Hall McAdams, an executive vice president of Union, stated that he arranged a meeting with FNMA officials where he told them that Union

> had to remain an approved FNMA seller servicer to maintain its right to service mortgages of its other investors and to continue to do business with the other public agencies, GNMA and Freddie Mac. [He] pointed out to [the FNMA officials] that if FNMA terminated the Contract for cause it would effectively put the Bank out of business as a mortgage seller/servicer.

Addendum to Brief of Appellant at 36.

In addition, McAdam continued:

> [The FNMA officials] recognized the effect termination would have on the Bank and together we agreed on an alternative to this action. I agreed that the Bank would sell its FNMA portfolio as soon as a buyer acceptable to FNMA could be located. I asked that FNMA allow the Bank to retain $1,000,000 worth of servicing and its status as a party to the FNMA seller/servicer contract. FNMA agreed to the Bank continuing to service $1,000,000 of mortgage loans FNMA owned. I agreed that the Bank would pay a fee for FNMA approval of the transfer in an amount equal to

ten basis points of the base amount of the mortgages transferred even though FNMA, I had been told, generally waived that requirement.

*Id.*[9]

In the second affidavit, Steve Armstrong, a senior vice president of Union, stated that at the meeting:

> Hall McAdams requested that the Bank be permitted to continue to service a small FNMA mortgage loan portfolio in order that it might retain its status as an approved FNMA Seller/Servicer and as a party to a FNMA Mortgage Selling and Servicing Contract. FNMA ultimately agreed to this request.

Addendum to Brief of Appellant at 39.

In addition, Union cited the June 10, 1985, letter from FNMA memorializing the transfer and settlement agreement it had reached with Union. In that letter, FNMA acknowledged that as part of the agreement Union would "retain approximately one million in servicing and * * * continue as a Fannie Mae approved lender."

On May 13, 1987, a telephone conference call was held before the district court. In that call, the court questioned FNMA why, if it believed it had the right to terminate the Contract without cause, it had not done so and was forcing upon the court complex issues having to do with a termination for cause.[10] The court further stated:

> I must say I somewhat disagree with the suggestion of Union that there is some sort of an election here that has occurred that prevents [FNMA] from now attempting to proceed under the contract provision that says termination without cause. I haven't made any determinations that that provision is unlawful at this point. And I guess until someone attempts to exercise it, there is no issue before the Court in that connection. * * * My inclination is to say to Fannie

---

9. In fact, the transfer fee paid was $216,528.16.

10. The court stated:
   My question, though, is to the defendant. If you believe that you have the right to terminate without cause, why are you putting this Court—if you are correct, why are you putting

this Court and everybody else to, you know, a lawsuit that could go on for months and involve as it now develops innumerable issues by proceeding under the with cause clause? Transcript of May 13, 1987 Conference Call at 22.

Mae, "If you feel you have the right and you'd like to vindicate it, then, I'd say, go forward." And then we can pick up on it, depending upon Union's reaction to it. Transcript of May 13, 1987 Conference Call at 25.

On July 2, 1987, FNMA informed Union by letter that it intended to terminate the Contract, without cause, effective August 3, 1987. In response, Union filed another motion with the district court seeking to stay the effect of the without cause termination pending resolution of the litigation. In addition, after the May 13 conference call, Union sought leave to file a second amended complaint. The complaint sought to add claims for violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68, and for tortious interference with business relations. FNMA filed a response opposing leave to file the amended complaint.

On July 27, 1987, the district court held a hearing to consider the pending motions and, on July 29, 1987, issued an order granting Union's motion to amend its complaint, granting FNMA's motion for summary judgment, denying Union's motion for a preliminary injunction as moot, and dismissing Union's amended complaint.[11] In so ruling, the court stated that FNMA's attempted "without cause" termination of the Contract focused the dispute squarely on two related issues. First, whether FNMA breached an implied covenant of good faith by attempting to terminate the contract without cause and, second, whether the clause is unenforceable because it is unconscionable or against public policy. Addressing these issues, the court held that the narrow restrictions Arkansas law places on the exercise of an "at will" termination do not apply in this case and that the clause is not unenforceable as against public policy, nor was it unconscionable.

In addition, the court found that both the tortious interference and RICO claims required, at a minimum, some showing that

FNMA's threatened and attempted termination of the Contract was contrary to the agreement of the parties. Thus, the court held that because FNMA was entitled to terminate the Contract without cause, the tortious interference and RICO claims must be dismissed. Union appeals.

## II. JURISDICTION

■ FNMA contends that this Court's jurisdiction extends only to the question of the propriety of the district court's grant of summary judgment on the issue of the preliminary injunction and that this Court does not have jurisdiction to consider the trial court's dismissal of Union's tortious interference and RICO claims. We disagree.

Pursuant to 28 U.S.C. § 1292(a)(1), this Court's jurisdiction extends to "interlocutory orders of the district courts * * * granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions * * *." Interpreting the section, this Court has held that "where jurisdiction exists over an appeal from the denial of an injunction, and where the injunction is interdependent with the remainder of the appealed order, we may review the entire order insofar as it has been appealed." In re: Federal Skywalk Cases, 680 F.2d 1175, 1180 (8th Cir.), cert. denied, 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982).

Applying this standard, it is clear that this Court has jurisdiction to review the district court's order denying Union an injunction. It is also clear that Union's tortious interference and RICO claims are dependent on the resolution of the issues necessarily resolved in reviewing the order denying injunctive relief. Thus, we hold that this Court has jurisdiction to consider those claims.

## III. WITHOUT CAUSE TERMINATION

■ Union contends that the district court erred in failing to find that a clause

---

**11.** As a result of the court's ruling, all that remains to be adjudicated is FNMA's counterclaim seeking to recover for Union's alleged breach of contract. Union had moved the court to appoint a special master to consider that

claim. In its July 29, 1987, order the court denied Union's motion, and the counterclaim remains in the district court pending the outcome of this appeal.

in the Contract allowing FNMA to terminate the agreement without cause was unenforceable as contrary to public policy.[12] We disagree.

Under Arkansas law,[13] a contractual right to terminate a contract "at will" or "without cause" is subject to narrow limitations. For example, in the employment context, the Arkansas Supreme Court has recognized a public policy exception allowing at will employees to sue in contract for wrongful discharge if the cause of the discharge relates to the employee's alleged reporting of the employer's illegal acts. *Sterling Drug, Inc. v. Oxford,* 294 Ark. 239, 743 S.W.2d 380 *reh'g denied,* 294 Ark. 239, 747 S.W.2d 579 (1988) (per curiam with dissent). This Court essentially predicted the result in *Oxford* when, in applying Arkansas law, we ruled that an at will employee could maintain an action for breach of an implied covenant of good faith when the employer discharged her for refusing the sexual advances of the employee's supervisor. *See Lucas v. Brown & Root, Inc.,* 736 F.2d 1202 (8th Cir.1984).

In both *Oxford* and *Lucas,* the respective courts examined the parameters of the exception to the at will doctrine and found that they come into play "when the reason alleged to be the basis for the discharge is so repugnant to the general good as to deserve the label 'against public policy'." *Lucas,* 736 F.2d at 1204-05. In elaborating on the sources of "public policy," the *Oxford* court stated that, "[i]t is generally recognized that the public policy of a state is found in its constitution and statutes." 743 S.W.2d at 385.

While we have some reservations about applying employment discharge cases to a dispute involving a commercial contract, we agree with the district court that Arkansas has not yet recognized an exception to "at will" or "without cause" contract termination doctrine applicable to the instant case. Stripped to its essentials, Union's claim is that FNMA attempted to use its dominant position in the secondary mortgage market to advance its more favorable reading of its rights under the agreement with Union. While such behavior certainly indicates FNMA's willingness to engage in cold-hearted economic competition, it simply does not violate any recognized Arkansas public policy.

## IV. CONTRACT MODIFICATION

■ Finding that the clause is enforceable does not, however, end the matter. Union contends, in the alternative, that even if FNMA could take advantage of such a clause, the Contract was modified

**12.** The district court also ruled that, despite a substantial inequality in the bargaining power of the parties, the Contract was not unconscionable. Neither party appears to have appealed from this ruling. Nonetheless, we affirm the district court in this regard.

**13.** Union contends that the governmental character of FNMA and the federal function FNMA performs requires application of federal law. As the Supreme Court has recognized, "federal law governs questions involving the rights of the United States arising under nationwide federal programs." *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979). Yet, as this Court has noted, FNMA is not a governmental entity. *Warren v. Government National Mortgage Ass'n,* 611 F.2d 1229 (8th Cir.1980). Rather, for the purposes of this case, FNMA is essentially a private entity. *Roberts v. Cameron–Brown Co.,* 556 F.2d 356, 359 (5th Cir.1977). Thus, because the issues presented in this case do not involve "the rights of the United States arising under [a] nationwide federal program," but instead involve only the rights of private litigants who, despite extensive federal regulation, retain their essentially private character, federal law does not control.

Concerning the choice of applicable state law in this diversity case, the district court was obligated to apply the substantive law of Arkansas, the state in which it sat. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Therefore, Arkansas choice of law principles apply. Since the agreement of the parties did not specify the law to be applied, a "significant contacts" or "center of gravity" test is appropriate. *See Tiffany Indus., Inc. v. Commercial Grain Bin Co., Inc.,* 714 F.2d 799, 801 (8th Cir.1983) (citing *Standard Leasing Corp. v. Schmidt Aviation,* 264 Ark. 851, 576 S.W.2d 181, 184 (1979)). Applying this standard, the district court Arkansas law applicable because Union's business is located in Arkansas. We ordinarily give great weight to the district court's interpretation of the law of the state in which it sits. *Frensley v. National Fire Ins. Co. of Hartford,* 856 F.2d 1199, 1202 (8th Cir.1988). Accordingly, we affirm the decision of the district court to apply Arkansas law.

by the settlement agreement reached with FNMA in June of 1985. More specifically, Union contends that in return for agreeing to transfer its FNMA owned loan portfolio to another approved lender and to pay the requisite transfer fee, it received from FNMA the right to continue to be a party to the Contract as the servicer of the retained loans. As evidence of the modification, Union points to the McAdams and Armstrong affidavits, as well as the June 10, 1985, letter to Union by Deane Hall, a senior vice president of FNMA.

FNMA disputes Union's contentions on two grounds. First, it argues that the evidence cited by Union in support of the modification indicates only that Union would continue *as a party to the general FNMA seller/servicer agreement.* Thus, since the general agreement allows FNMA to terminate the Contract without cause, it was entirely within its rights to do so after the June 1985 agreement to transfer the FNMA owned mortgage loans. Second, it argues that the terms of the transfer agreement are set forth completely in an October 31, 1985 "Consent to Transfer" agreement signed by both FNMA and Union and therefore the evidence offered by Union in support of modification is barred by the parol evidence rule.

The district court accepted FNMA's argument that the evidence cited by Union indicates only that Union would continue as a party to the general agreement which allowed without cause termination. In so doing, the court stated that the modification argument advanced by Union "certainly has logical appeal" insofar as "[w]ithout any assurance of a continued relationship, free from the threat of a possible immediate *without cause,* termination, the benefit derived by the bank from the transfer was limited." Order at 8. Nonetheless, after examining the evidence Union offered in support of its modification contention, the court stated that, "it seems clear that the June 1985 agreement merely continued the status quo ante with respect to the $1,000,-000 worth of servicing under the terms of the underlying servicing contract." The court summarized its findings, stating, "It is not enough to argue that Union would be

foolish not to insist upon such a change. The undisputed facts reveal that no change in that connection was made." Order at 10.

We cannot agree with the district court's conclusion. According to Federal Rule of Civil Procedure 56, summary judgment is appropriate if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Interpreting this standard, the Supreme Court has recognized that summary judgment is inappropriate, "[i]f reasonable minds could differ as to the import of the evidence." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

This Court previously adopted a formulation of the same standard, stating:

> Evaluative judgment between two rationally possible conclusions from facts cannot be engaged in on summary judgment. Only where the facts supportive of a summary judgment can be held to have so unambiguously established the actualities of a situation as to leave no basis of substance for dispute as to their reality or as to the conclusion required from them is a summary judgment entitled to be entered.

*Chenette v. Trustees of Iowa College,* 431 F.2d 49, 53 (8th Cir.1970); *see also Snyder v. United States,* 717 F.2d 1193, 1195 (8th Cir.1983); *Wermager v. Cormorant Township Board,* 716 F.2d 1211, 1214 (8th Cir. 1983); *Minnis v. United Automobile, Aerospace and Agricultural Implement Workers of America,* 531 F.2d 850, 854 (8th Cir.1976).

Applying this standard to this case, we hold that summary judgment was inappropriate because the evidence concerning modification presents conflicting "rationally possible conclusions." At base, the case presents the question of the proper interpretation of the June 10, 1985, letter purporting to memorialize the agreement of the parties. In particular, the case turns

upon the proper effect to be given that portion of the letter stating, "You wish to retain approximately one million in servicing and to continue as a Fannie Mae approved lender."

Of course, one "rational possibility" is the interpretation, advanced by FNMA and chosen by the district court—that the sentence only indicates Union may continue, as it had in the past, under the terms of the general FNMA seller/servicer agreement, including the without cause termination clause. Yet, in the context of the events surrounding the agreement and Union's clear desire to retain its status as an "approved" lender, another plausible interpretation of the sentence is that FNMA would not withdraw "approved" status from Union for some period into the future unless Union's servicing of the retained loans became deficient.

The settlement agreement clearly contemplates a continuing relationship between Union and FNMA. Yet, neither Union nor FNMA contend that the continuing relationship would involve either sales or servicing of additional mortgage loans beyond those retained by Union. Thus, it is clear that the primary purpose in Union's retention of one million dollars in loan servicing was to permit it to extend its "approved" status into the future. The question is, "How far into the future?" Under the interpretation offered by FNMA, the "continuing relationship" could be discontinued at any time for any reason. Under Union's interpretation, FNMA's agreement to allow Union "to continue as a Fannie Mae approved lender," is inconsistent with the without cause termination clause. In other words, Union contends that the without cause termination provision must fall because it is inconsistent with the continuing relationship contemplated by the June 10 letter.

It is also important to note that Union paid a transfer fee of more than two hundred thousand dollars as part of the settlement and alleges that it sold its FNMA owned loan portfolio to FirstSouth at less than the market rate. A reasonable inference that could be drawn from these facts is that Union would receive something more in return than FNMA's agreement to continue Union's approved status until such time as FNMA, in its complete discretion, discontinued it. Thus, Union's payment of the transfer fee and alleged sale of the portfolio at a below market rate could reasonably lead to the conclusion that the parties agreed to extend Union's approved status into the future and is inconsistent with a contract term allowing FNMA to terminate the Contract without cause.

■ Alternatively, FNMA contends that, even if the evidence offered by Union concerning modification presents a genuine factual dispute, the parol evidence rule bars consideration of it. We disagree. Under Arkansas law, the parol evidence rule "requires, in the absence of fraud, duress, mutual mistake, or something of the kind, the exclusion of all prior or contemporaneous, oral or written evidence that would add to or vary the parties' integrated written contract, which is unambiguous." *Montwood Corp. v. Hot Springs Theme Park Corp.,* 766 F.2d 359, 361 (8th Cir. 1985) (quoting *Walt Bennett Ford, Inc. v. Dyer,* 4 Ark.App. 354, 631 S.W.2d 312, 313 (1982)); *see also Starling v. Valmac Indus. Inc.,* 589 F.2d 382, 386 (8th Cir.1979).

In this case, the rule does not apply to the evidence Union offered in support of its modification claim for a number of reasons. First, the rule bars only evidence concerning prior or contemporaneous modifications of the integrated agreement. Thus, if the agreement allegedly modified is the general FNMA seller/servicer agreement, evidence concerning a subsequent modification of that agreement in June of 1985 is not barred by the rule.

Second, if, as FNMA contends, the final agreement of the parties is the Consent to Transfer agreement executed in October of 1985, FNMA fares no better. The rule bars only evidence which would add to or vary an unambiguous and complete agreement of the parties. Yet, examination of the Consent to Transfer agreement reveals that it is neither complete nor unambiguous. Rather, the agreement appears only to distribute rights and responsibilities be-

tween Union and FirstSouth for the loans transferred. It does not in any way attempt to set forth the rights of Union or FNMA under the existing seller/servicer contract between them. More specifically, it does not address the terms under which the existing contract between Union and FNMA could be terminated.[14] Accordingly, we hold that the parol evidence rule does not bar admission of extrinsic evidence offered to interpret the general seller/servicer agreement.

In sum, we find that the evidence before the district court presented at least two rational possibilities concerning the proper interpretation of the June 10, 1985 letter. Determining which of the possibilities more closely mirrors the intention of the parties presents a genuine issue of material fact for the jury. *Cf. Amerdyne Indus., Inc. v. POM, Inc.*, 760 F.2d 875, 877 (8th Cir.1985) ("The construction and legal effect of a written agreement are questions of law *except* where the meaning of the language

depends upon disputed extrinsic evidence."). Thus, we remand to the district court for a trial on the issue whether the June 10, 1985 letter modified the without cause provision in the general FNMA seller/servicer contract originally entered into by Union and FNMA.

## V. THE RICO CLAIM

■ We next address the district court's dismissal of Union's RICO claim.[15] As the district court recognized, the basis for the RICO claim is Union's allegation that FNMA used its economic power to force Union to forego its rights under the Contract. The claim encompasses two types of conduct. First, Union claims that FNMA wrongfully threatened and attempted to terminate the Contract without cause, despite knowing that the Contract had been modified to preclude such termination. Second, Union states that FNMA threatened termination for cause and instituted a counterclaim for breach of the Contract,

---

14. Indeed, even with respect to the issue whether Union would remain responsible to FNMA for loans transferred to FirstSouth, the transfer agreement may be ambiguous. Paragraph 5 of the agreement states in part:

> [FirstSouth] hereby assumes and agrees to perform in [Union's] stead, those responsibilities, duties, and warranties of [Union] under the Fannie Mae Mortgage Selling and Servicing Contract hereinabove described, as applicable to such mortgages, as fully as though the same had been entered into or given by [FirstSouth].

In contrast, paragraph 7 of the agreement states:

> [Union] agrees that nothing herein shall be construed as releasing [Union] from any liabilities under or obligations which may have accrued or may accrue, under [Union's] contractual arrangements with Fannie Mae.

In any event, we emphasize that the question whether the transfer of the loans to FirstSouth was without recourse to Union is one that remains to be determined on remand. We recognize that the issue will be of considerable importance because it may affect the outcome, not only of FNMA's breach of contract counterclaim against Union, but also the question whether Union had cause to terminate the Contract should it be found that the Contract was modified to preclude without cause termination. We emphasize, however, that we express no opinion on the issue whether the transfer to FirstSouth was without recourse.

15. Union contends that we should remand the RICO and tortious interference claims because the district court inappropriately dismissed

them without FNMA bringing a motion for summary judgment. We disagree. Although this Court has consistently rejected the entry of summary judgment sua sponte by district courts, *see Williams v. City of St. Louis*, 783 F.2d 114, 116 (8th Cir.1986), this case does not present such a situation.

In addressing the RICO and tortious interference claims, the district court properly recognized they were dependent upon Union's contention that FNMA wrongfully threatened to terminate the contract in an attempt to force Union into repurchasing loans it was under no obligation to repurchase. A necessary part of that contention is that FNMA engaged in such conduct without a reasonable claim of right to do so. After finding that FNMA could terminate the contract without cause, the district court simply went on to hold that FNMA's threats or attempts to do what it had a right to do could not give rise to a RICO or tortious interference claim. Thus, the district court did not act improperly in dismissing the claims.

As we recognized in holding that we have jurisdiction to address all of the issues on appeal, the RICO and tortious interference claims are interdependent with the issues involved in the motion for a preliminary injunction. Although we reverse the district court's award of summary judgment on the issue of injunctive relief, our disposition of the issue also precludes relief on the RICO and tortious interference claims.

despite knowing that the transfer to First-South relieved Union of all liability on the transferred loans.

The district court did not address the first contention because it found that the Contract had not been modified to preclude termination without cause. With respect to the second contention, the district court found that the claims raised in FNMA's counterclaim presented unresolved factual issues that would have to be tried to a jury.[16] Nonetheless, the court found that FNMA's actions did not support a RICO claim. The court found that, even assuming FNMA "was baldly exercising its economic might in order to force Union to forego or give up its legitimate claims with respect to the defaulted loans," such activity would not support a RICO claim.

The touchstone of Union's theories is that FNMA engaged in "economic terrorism" by using its superior bargaining position to attempt to take that which rightfully belonged to Union (either "approved status" or money). Union claims that such behavior constitutes the predicate RICO acts of extortion in violation of 18 U.S.C. § 1951(b)(2), and wire fraud in violation of 18 U.S.C. § 1343. It is clear, however, that FNMA's demands on Union were motivated by its interpretation of the agreement. Our holding concerning the issue of contract modification and the decision of the district court concerning the breach of contract counterclaim, indicate that there are genuine factual disputes as to the proper interpretation of the parties' agreement. In this light, whatever proves to be the proper interpretation of the parties' agreement, we decline to hold that FNMA acted in an extortionate or fraudulent manner in making the demands that it did. *Cf. I.S. Joseph Co., Inc. v. J. Lauritzen A/S*, 751 F.2d 265, 266–67 (8th Cir.1984) (threats to file groundless civil lawsuit insufficient coercion to constitute extortion as a basis for a RICO claim). Thus, we hold that the

district court properly dismissed Union's RICO claim.

## VI. TORTIOUS INTERFERENCE

Union's second amended complaint also alleged that FNMA tortiously interfered with its contractual and business relations. Under Arkansas law, a claim for tortious interference with contractual or business relations has four elements: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *McGee v. Hester*, 724 F.2d 89, 92 (8th Cir.1983) (citing *Mason v. Funderburk*, 247 Ark. 521, 446 S.W.2d 543, 547 (1969)); *see also, T.P. Leasing Corp. v. Baker Leasing Corp.*, 293 Ark. 166, 732 S.W.2d 480 (1987); *L.L. Cole & Son, Inc. v. Hickman*, 282 Ark. 6, 665 S.W.2d 278 (1984); *Walt Bennett Ford, Inc. v. Pulaski County Special School Dist.*, 274 Ark. 208, 624 S.W.2d 426 (1981); *Stebbins & Roberts, Inc. v. Halsey*, 265 Ark. 903, 582 S.W.2d 266, 268 (1979).

The district court dismissed Union's tortious interference claim reasoning that its finding allowing FNMA to terminate the Contract "without cause" defeated the tortious interference claim as well. Order at 33. Although we have determined that the "without cause" termination issue presents a genuine factual issue inappropriate for summary judgment, we nonetheless affirm the district court's dismissal of Union's tortious interference claim.

FNMA's conduct must be examined in light of our holding that Union's claim that the Contract was modified presents a genuine factual dispute and the district court's holding that the question whether Union's transfer of its FNMA owned loan portfolio to FirstSouth was without recourse also

---

**16.** Although the court's finding concerning without cause termination avoided the necessity of determining whether FNMA could have terminated the contract for cause, such a determination raises essentially the same issues as

FNMA's breach of contract counterclaim. This is because the alleged cause for termination is Union's breach of contract by failing to repurchase loans that it was obligated to repurchase.

represents a genuine factual dispute. In other words, both Union and FNMA have opposing, but reasonable, views as to material terms of their agreement.

The fact that FNMA asserted in good faith what it reasonably believes to be its rights under the agreement does not constitute.evidence of an intent to interfere with Union's contractual rights or business relations. *Cf. McGee*, 724 F.2d at 92 (police enforcement of liquor laws is proper despite incidental interference with business of liquor store owner). Thus, even if, as Union alleges, FNMA knew or should have known that termination of the Contract would cause other participants in the secondary mortgage market to cease dealing with Union, FNMA's motive in acting as it did is sufficient to defeat Union's tortious interference claim. In sum, because FNMA's actions are supported by a reasonable interpretation of the agreement of the parties, they cannot give rise to a claim that FNMA intentionally interfered with Union's business relations with other secondary mortgage market participants.

## VII. CONCLUSION

Reduced to its essentials, this case presents a dispute between two parties with differing interpretations of their agreement. The dispute raises genuine issues of material fact and was therefore inappropriately resolved on a motion for summary judgment. The existence of a genuine dispute, however, acts as a bar to Union's RICO and tortious interference claims. Accordingly, we affirm the district court's dismissal of the RICO and tortious interference claims and remand for further proceedings consistent with this opinion.