**GRAHAM WEBB INTERNATIONAL LIMITED PARTNERSHIP, a Minnesota Limited Partnership, Plaintiff,**

v.

**EMPORIUM DRUG MART, INC., d/b/a Drug Emporium, an Arkansas Corporation, Defendant.**

**No. LR–C–95–327.**

United States District Court, E.D. Arkansas. Western Division.

Nov. 3, 1995.

Roger D. Rowe, Nancy Bellhouse May, Wright, Lindsey & Jennings, Little Rock, AR, Daniel I. Maertens, Dean R. Karau, Fredrikson & Byron, P.A., Minneapolis, MN, for Graham Webb International Limited Partnership, a Minnesota limited partnership.

Joseph Davidson Calhoun, III, Gill Law Firm, Little Rock, AR, for Emporium Drug

Mart, Inc., an Arkansas corporation dba Drug Emporium.

## MEMORANDUM OPINION AND ORDER

SUSAN WEBBER WRIGHT, District Judge.

Graham Webb International Limited Partnership ("Graham Webb") brings this action against Emporium Drug Mart, Inc. ("Drug Emporium") claiming trademark infringement, unfair competition, damage to business reputation, and tortious interference with contract or prospective relations. The matter is before the Court on motion of Drug Emporium for summary judgment [doc. # 20]. Graham Webb has filed a response in opposition to the motion. For the reasons that follow, the Court finds that Drug Emporium's motion for summary judgment should be and hereby is granted.[1]

### I. Background

Graham Webb is a Minnesota limited partnership engaged in the business of manufacturing, marketing, and distributing hair care, bath, cosmetic, and related products throughout the United States through distribution agreements with various local distributors. Drug Emporium is an Arkansas corporation engaged in the business of selling products to the general public through a retail store in Little Rock, Arkansas.

Graham Webb has the exclusive right to use and license the use of the "Graham Webb" trademark in the United States. Graham Webb distributes its line of Graham Webb hair care products in that area of Arkansas which includes Little Rock, pursuant to an exclusive distribution contract with Heil Beauty Supply ("Heil"), a distributor with its principal place of business in Paducah, Kentucky. Heil's distributorship agreement with Graham Webb prohibits it from selling Graham Webb products into other distributor's territories and, likewise, protects Heil from other Graham Webb distributors selling into its territory.

Graham Webb sells its products only to distributors, and these distributors are restricted to reselling Graham Webb products only to salons that meet certain requirements set out by Graham Webb. Graham Webb states it has adopted this strategy of limited distribution because of the critical advisory role that experienced and qualified hair care professionals play in selecting the proper products for customers and in instructing those customers in the proper use of the products. In this regard, Graham Webb states that its products are designed to be professionally administered, based upon both the hair care professional's knowledge of the client's prior and current hair care needs, and the professional's knowledge of Graham Webb products. Thus, states Graham Webb, if no hair care professional has been involved in the product selection process, the Graham Webb product can be wrongly blamed for any adverse result that may occur. Graham Webb also states that such a strategy of limited distribution adds "mystique" to the Graham Webb product, and that the "mystique" is lost when Graham Webb products are sold by nonprofessionals in nonprofessional settings. Graham Webb states that both it and Heil have spent significant sums advertising and promoting Graham Webb products in Heil's territory, consistent with the assurance that Graham Webb products are intended to be administered by hair care professionals.

Graham Webb claims that a Heil sales representative selling Graham Webb products in the Little Rock area recently received complaints from a number of her professional salon customers that Drug Emporium is selling Graham Webb products at lower retail prices than the salons. These Graham Webb products are being sold with the product batch codes obliterated, which, it is alleged, prevents Graham Webb from identifying the distributor that sold the product, and which places the general public at risk in that the

---

[1]. Also before the Court is the motion of Graham Webb for a preliminary injunction (the hearing on which has been continued indefinitely at the request of the parties) [doc. # 3], motion of Graham Webb to compel discovery [doc. # 17], motion of Drug Emporium to compel discovery [doc. # 23], and motion of Drug Emporium for a protective order [doc. # 25]. These motions are rendered moot by today's action and need not be addressed.

absence of product batch codes prevents Graham Webb from identifying where and when the product was made as well as the raw materials used in its manufacture should a recall be necessary. Graham Webb claims that Drug Emporium's use of Graham Webb's trademarks is without authorization, and in violation of both Graham Webb's and Heil's rights to control the quality of the goods and the channels of distribution associated with those marks.

Upon learning of the unauthorized sale of Graham Webb products, Graham Webb sent a letter to Drug Emporium dated February 24, 1995, which requested that its products be removed from Drug Emporium shelves within 14 days. At the time it received Graham Webb's letter, Drug Emporium was informing customers of the following:

> Drug Emporium is not associated or affiliated with the manufacturer or salon or professional hair care products sold in these stores.

Soon after receiving Graham Webb's letter requesting discontinuation of sales, Drug Emporium posted the following disclaimer:

#### Attention Customers

> Graham Webb International cannot guarantee the authenticity of any product sold by an unauthorized retailer such as Drug Emporium. Graham Webb International states that its products are guaranteed only when sold through professional salons. If the UPC codes or other tracing codes are missing from any product container of a Graham Webb International product purchased by you, please retain your purchase receipt to assist in the tracing of that product in the unlikely event it is defective.

Drug Emporium did not, however, comply with Graham Webb's request that its products be removed from Drug Emporium shelves.

Having failed in its initial request that its products be removed from Drug Emporium shelves within 14 days, Graham Webb's counsel demanded in a letter dated March 21, 1995, that Drug Emporium cease and desist from its sale of Graham Webb products within three business days. Drug Emporium again did not comply with Graham Webb's demand and has refused Graham Webb's request that Drug Emporium identify its supplier of Graham Webb products.[2] On May 31, 1995, Graham Webb filed the lawsuit now before the Court.

### II. *Discussion*

Graham Webb asserts three claims in its complaint against Drug Emporium: (1) Drug Emporium's unauthorized sales of Graham Webb products constitutes trademark infringement and unfair competition in violation of the Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C. §§ 1114 *et seq.;* (2) Drug Emporium's unauthorized sales of Graham Webb products constitutes damage to business reputation under Arkansas' antidilution statute, Ark.Code Ann. § 4–71–113; and (3) Drug Emporium's unauthorized sales of Graham Webb products constitutes tortious interference with the contractual relationship between itself and Heil. Drug Emporium argues that there are no triable issues with respect to these claims and that it is entitled to summary judgment as a matter of law.

### A. *Standard of Review*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party has properly supported its motion for summary judgment, the nonmoving party must "do more than simply show there is some metaphysical doubt as to the material facts."

---

2. Graham Webb states that if Drug Emporium is purchasing Graham Webb products from a Graham Webb distributor, those sales are in violation of Graham Webb's distributorship agreement. Drug Emporium claims, however, that it does not purchase Graham Webb products directly from a vendor within Graham Webb's authorized chain of distribution.

*Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The nonmoving party may not rest on mere allegations or denials of his pleading, but must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e) and adding emphasis). *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. at 1356 (citations omitted). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (citation omitted).

### 1. *Lanham Act Claims*

#### A. *Trademark Infringement*

■ An action for trademark infringement under the Lanham Act arises where "[a]ny person ... without the consent of the registrant ... use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods ... [and] such use is likely to cause confusion." Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). Likelihood of confusion is the basic test of trademark infringement. 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23.01 (3rd ed. 1993). *See also Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.,* 988 F.2d 587, 590 (5th Cir.1993) (likelihood of consumer confusion is the "linchpin" of a trademark infringement claim). Whether likelihood of confusion exists in a given case is a factual determination, made upon consideration of all the circumstances. *ConAgra Inc. v. George A. Hormel*

& *Co.,* 990 F.2d 368, 369–71 (8th Cir.1993); *Anheuser–Busch, Inc. v. Balducci Publications,* 28 F.3d 769, 773 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 903, 130 L.Ed.2d 787 (1995).[3]

Drug Emporium moves for summary judgment on grounds that the sale of genuine Graham Webb products with a disclaimer as to authorization or affiliation with Graham Webb is not actionable under the Lanham Act. It argues there is no likelihood of confusion arising from its actions since it is merely placing on its shelves and selling Graham Webb products which are virtually identical, from a consumer's perspective, to Graham Webb products available through authorized salons. The Court agrees.

■ As a general rule, trademark law does not apply to the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner. *Shell Oil Co. v. Commercial Petroleum, Inc.,* 928 F.2d 104, 107 (4th Cir.1991). *See, e.g., Sebastian International, Inc. v. Longs Drug Stores Corporation,* 53 F.3d 1073 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 302, 133 L.Ed.2d 207 (1995); *Matrix Essentials,* 988 F.2d at 593; *Polymer Technology Corp. v. Mimran,* 975 F.2d 58, 61 (2nd Cir.1992); *NEC Electronics v. CAL Circuit Abco,* 810 F.2d 1506, 1509 (9th Cir.), *cert. denied,* 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987). This is because trademark law is designed to prevent sellers from confusing consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold. *NEC Electronics,* 810 F.2d at 1509 (citation omitted). *See also John Paul Mitchell Systems v. Pete–N–Larry's Inc.,* 862 F.Supp. 1020, 1023 (W.D.N.Y.1994) (noting that when the products are genuine, *i.e.,* identical and from the same origin, there is nothing that would confuse consumers and the requisite consumer confusion cannot be demonstrated). Thus,

---

**3.** In addition to invoking the provisions of the Lanham Act, Graham Webb claims that Drug Emporium's actions violate Arkansas' trademark statutes, Arkansas Code Annotated, Title 4, Chapter 71. Although Graham Webb does not cite to a specific statute, a claim of trademark infringement under Arkansas law must meet the test required by the Lanham Act provisions for trade-

mark infringement. *See Gaston's White River Resort v. Rush,* 701 F.Supp. 1431, 1435 (W.D.Ark.1988). Accordingly, the Court's analysis and findings with respect to Graham Webb's Lanham Act claims will apply to any Arkansas trademark infringement claims Graham Webb may be asserting.

a purchaser who does no more than stock, display, and resell a, producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act. When a purchaser resells a trademarked article under the producer's trademark, and nothing more, there is no actionable misrepresentation under the statute.

*Sebastian International, Inc.,* 53 F.3d at 1076.

Graham Webb argues, however, that the general rule regarding resale of genuine goods does not apply in this case because a material difference exists between its products and the Graham Webb products sold by Drug Emporium sufficient to create a likelihood of consumer confusion. Specifically, Graham Webb argues that the unauthorized sale by Drug Emporium of Graham Webb products in containers with the product batch codes obliterated, and without the Graham Webb assurance of quality results, puts a physically inferior product on the market that differs in a material way from that sold through authorized Graham Webb channels and, therefore, the product is not "genuine." Graham Webb goes on to argue that the warnings Drug Emporium has posted disclaiming affiliation with or authorization by Graham Webb are ineffective and that the sale of Graham Webb products outside of professional salons is likely to cause confusion in that inadequate results will be obtained by consumers who select Graham Webb products without professional consultation.

During a hearing held on October 12, 1995, Graham Webb orally moved for leave to amend its complaint in order to assert as an additional argument that the products involved may be counterfeit. That motion is denied since, in addition to being untimely, there is no basis in the record for concluding that the products may be counterfeit nor was anything presented at the hearing that would support such an assertion. Graham Webb indicates in its complaint, motion for preliminary injunction, and supporting affidavits that the products being sold by Drug Emporium are actual Graham Webb products. Indeed, Graham Webb's theory of the case has always been that notwithstanding the fact that it manufactured the products, a Lanham Act claim is stated because the batch codes on the products have been obliterated, the products are being sold outside the Graham Webb chain of distribution, and the products are being sold without professional consultation. It is only in Graham Webb's response to Drug Emporium's motion for summary judgment that Graham Webb first asserts that the products may be counterfeit. However, Graham Webb's response to the motion for summary judgment specifically adopts the statement of facts set forth in its motion for preliminary injunction and adopts the supporting affidavits, all of which were sworn to under oath as being truthful and which are consistent in the view that the products involved are actual Graham Webb products. That being so, and considering Graham Webb's representations throughout the proceedings, this Court can only conclude that there are no *genuine* issues for trial with respect to Graham Webb's new theory that the products may be counterfeit. Accordingly, this Court will address Graham Webb's arguments in light of its representations that it manufactured the products in question.

■ It is true that genuine goods may be involved in a trademark infringement case if a likelihood exists of confusing the public with respect to either sponsorship and affiliation or responsibility for quality. *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.,* 756 F.Supp. 280, 282 (W.D.La.1991), *aff'd.,* 988 F.2d 587. *See, e.g., Burger King Corp. v. Mason,* 710 F.2d 1480, 1492 (11th Cir.1983) (falsely suggesting affiliation with trademark owner in a manner likely to cause confusion as to source or sponsorship constitutes infringement), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984); *Professional Golfers Ass'n v. Bankers Life & Casualty Co.,* 514 F.2d 665, 670 (5th Cir. 1975) (same); *El Greco Leather Products Co., Inc. v. Shoe World,* 806 F.2d 392, 395 (2nd Cir.1986) (finding trademark infringement where defendant sold plaintiff's uninspected shoes and inspection was integral part of plaintiff's quality control), *cert. denied,* 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987); *Shell Oil Co.,* 928 F.2d at 107

(defendant infringed Shell trademark by marketing bulk oil in violation of Shell's quality control standards). Trademark infringement may also occur in the case of damaged goods if "there exists a material difference between the products sufficient to create a likelihood of consumer confusion." *Matrix Essentials, Inc. v. Cosmetic Gallery, Inc.,* 870 F.Supp. 1237, 1251 (D.N.J.1994) (quoting *John Paul Mitchell Systems,* 862 F.Supp. at 1023). Courts will find such a "material difference" if the goods are " 'seconds' of inferior quality" or have been "taint[ed] . . . by mishandling." *Id.* (quoting *Henry v. Chloride, Inc.,* 809 F.2d 1334, 1350 (8th Cir. 1987)). *See, e.g., Adolph Coors Co. v. A. Genderson & Sons, Inc.,* 486 F.Supp. 131, 135 (D.Colo.1980) (unauthorized sale of Coors beer constituted trademark infringement where beer was sold in a damaged condition).

■ In this case, there does not exist such a material difference between the products sufficient to create a likelihood of consumer confusion. This is not a case in which the goods are " 'seconds' of inferior quality" or have been "taint[ed] . . . by mishandling." *Chloride, Inc.,* 809 F.2d at 1350. It is not a situation, for example, in which there is some defect or potential defect in the product itself that the customer would not be readily able to detect. *See Matrix Essentials,* 988 F.2d at 591. Nor is it a situation in which there has been a showing that the products are counterfeit or have been tampered with in some manner likely to cause confusion. *Cf. John Paul Mitchell Systems,* 862 F.Supp. at 1027 (where the court noted that it could not be said that Paul Mitchell products with obliterated codes were genuine as a matter of law in view of the physical change the obliteration had worked on the bottles, the information printed thereon, and the liquid contained therein). The situation here is that the quality of the products sold by Drug Emporium is essentially identical to those sold at authorized salons. Nothing in the record suggests that Drug Emporium has taken any action that can be construed as creating a likelihood of consumer confusion.

At the October 12th hearing, Graham Webb submitted for the Court's examination several Graham Webb products with obliterated batch codes that purportedly were purchased at the Drug Emporium and were representative of the Graham Webb products being sold there. Although Drug Emporium objected to the Court's consideration of these products, the product itself did not appear to be compromised in any of the bottles and the minor aesthetic damage, which if anything consisted of almost imperceptible scratches on the bottom of the bottles, did not in any manner create a likelihood that consumers would think that Graham Webb intentionally distributed shoddy goods. *Cf. Matrix Essentials,* 870 F.Supp. at 1251–52. There simply was no indication that the removal of the batch codes defaced the bottles or compromised the quality of Graham Webb products themselves as was the case in *John Paul Mitchell Systems,* and nothing in the photographic exhibits submitted in support of the motion for preliminary injunction indicates any defacement that would confuse consumers. The mere removal of batch codes from product containers, as occurred in this case, does not give rise to the element of likelihood of consumer confusion necessary for a Lanham Act claim. *Matrix Essentials,* 870 F.Supp. at 1251–52.

■ It is of no import that the Graham Webb products are being sold unaccompanied by professional consultation. Recent courts have become more skeptical of the need for professional consultation in the sale of goods, *see Matrix Essentials,* 870 F.Supp. at 1253, and this Court likewise concludes that Drug Emporium's sale of Graham Webb products unaccompanied by professional consultation does not give rise to a likelihood of consumer confusion. No customer who went to Drug Emporium to buy Graham Webb products was confused or deceived as to whether they were getting a cosmetologist's consultation with their purchase. *Cf. Matrix Essentials,* 988 F.2d at 591. In fact, it appears that several professional salons are themselves selling Graham Webb products without any analysis or advice concerning hair care needs. *See* Motion of Drug Empo-

rium for Summary Judgment, Exhibit 3 (Affidavit of Diane Schratz).[4]

■ The Court likewise rejects Graham Webb's argument that the warnings Drug Emporium has posted disclaiming any affiliation with or authorization by Graham Webb are ineffective and not a question properly resolved by summary judgment. While it is true that the effectiveness of a disclaimer in a Lanham Act case may generally be a question of fact, *see Home Box Office, Inc. v. Showtime/Movie Channel, Inc.,* 832 F.2d 1311, 1315 (2nd Cir.1987), a disclaimer expressly declaring that the seller is "not affiliated" with the owner of the trademark or is "not an authorized distributor" of the trademark owner's products has been held to be an effective means of preventing confusion in the minds of consumers as to affiliation with the owner of the trademark. *Matrix Essentials,* 756 F.Supp. at 282. As in *Matrix Essentials,* the only reasonable conclusion in this case is that Drug Emporium's warnings to consumers disclaiming any affiliation with or authorization by Graham Webb effectively prevents likelihood of confusion in the minds of consumers as to sponsorship or affiliation.

In sum, the Court concludes that the element of likelihood of consumer confusion is absent in this case, and that Graham Webb has thus failed to establish a basis for a viable trademark infringement claim.

### B. *Unfair Competition*

■ Although not specifically set forth in the complaint, Graham Webb appears to also assert a claim of unfair competition under section 43(a) of the Lanham Act. That section imposes liability upon one who, in connection with the sale of goods, makes a false or misleading representation of fact that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods ..." 15 U.S.C. § 1125(a). As with a claim of trademark infringement, "the touchstone of a section 1125(a) unfair competition claim is whether

the defendants' actions are 'likely to cause confusion.'" *Matrix Essentials,* 988 F.2d at 592. The Court has already rejected the argument that Drug Emporium's unauthorized sale of Graham Webb products with the batch codes obliterated and without professional consultation gives rise to a likelihood of consumer confusion and constitutes trademark infringement. Thus, any unfair competition claim Graham Webb may be asserting fails for the same reason as its trademark infringement claims. *See id.* at 592–93 (rejecting unfair competition claim); *Matrix Essentials,* 870 F.Supp. at 1253 (same).

### 2. *Damage to Business Reputation*

■ In addition to its Lanham Act claims, Graham Webb claims that Drug Emporium's unauthorized use of the Graham Webb trademarks is diluting the distinctive quality of the marks, and is causing confusion as to the source, sponsorship and quality of the goods sold under those marks. Graham Webb seeks relief pursuant to Ark.Code Ann. § 4–71–113, which provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark registered under this chapter, or a mark valid at common law, or a trade name valid at common law, shall be grounds for injunctive relief notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

This statute recognizes the value of a trade name in its own right and affords protection to the owner against its unauthorized use. *Williams v. Spelic,* 311 Ark. 279, 844 S.W.2d 305, 308 (1992). "Neither competition nor confusion on the part of customers is required." *Id.* "The issue is not one of competition, but of the *likelihood* of dilution of the trade name as an asset by its use by someone other than the owner." *Id.* (emphasis in original). *Cf. Anheuser–Busch, Inc.,* 28 F.3d at 777.

■ The Court finds nothing in the record that would justify granting the broad

---

4. Upon learning that the products were purchased without stylist recommendation, Graham Webb did take steps in an effort to prevent such

uncounseled sales from occurring in the future. *See* Supplemental Filing (Exhibit DRK–1 to Affidavit of Dean R. Karau) [doc. # 34].

injunctive relief Graham Webb seeks. There is no evidence of poor results or injuries arising from consumers' uncounseled use of Graham Webb products,[5] and there is no indication of lost sales or other economic damage. Even if the Court assumed that some salons would stop selling Graham Webb products if they were available in retail stores, or that such availability would reduce sales by salons that continued to stock Graham Webb products, there is no basis for concluding that these lost sales would be greater than the increased revenue resulting from the availability of the product in ordinary retail outlets. *Cf. Matrix Essentials,* 870 F.Supp. at 1242.

While a businesses' goodwill and tradename is certainly a valuable property right which will be diluted if the public is confused, *Spelic,* 311 Ark. 279, 844 S.W.2d at 309 (citation omitted), there is no survey or consumer-based evidence in the record suggesting a consumer belief that Graham Webb was countenancing the sale of defective or shoddy merchandise or that consumers were holding Graham Webb responsible for any bad results they may have obtained with Graham Webb products. *Cf. Matrix Essentials,* 870 F.Supp. at 1244. In any case, the Court has already concluded that Drug Emporium's warnings to consumers disclaiming any affiliation with or authorization by Graham Webb effectively prevents confusion in the minds of consumers as to sponsorship or affiliation. The Court has also concluded that no customer who went to Drug Emporium to buy Graham Webb products was confused or deceived as to whether they were getting a cosmetologist's consultation with their purchase. Accordingly, there are no triable issues with respect to Graham Webb's claim of damage to business reputation.

### 3. *Tortious Interference*

Graham Webb's final claim asserts that Drug Emporium knew of Graham Webb's advantageous economic relationship with Heil, and that Drug Emporium has intentionally and unlawfully interfered with that relationship. Graham Webb claims that Drug

Emporium's wrongful interference has caused and, unless enjoined, will continue to cause Graham Webb substantial damage.

■ Arkansas law recognizes that persons may sue for tort damages when their business has been tortiously interfered with by a third party. *Benny M. Estes & Assoc., Inc. v. Time Insurance Co.,* 980 F.2d 1228 (8th Cir.1992). The basic elements of tortious interference are (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Shakey's Inc. v. Caple,* 855 F.Supp. 1035, 1046 (E.D.Ark.1994) (citing *Nicholson v. Simmons First National Corp.,* 312 Ark. 291, 849 S.W.2d 483, 487 (1993)).

■ The Court has carefully considered the matter and concludes that the record in this case does not establish a viable tortious interference claim. Even assuming Graham Webb could establish the first three elements of a tortious interference claim, the Court has determined there is no basis in the record for concluding that any lost sales from professional salons would be greater than the increased revenue resulting from the availability of the product in ordinary retail outlets. Graham Webb has thus failed to establish the requisite element of damage from Drug Emporium's actions.

■ In any case, the actions of Drug Emporium in stocking and selling Graham Webb products with the batch codes removed and without professional consultation are supported by a reasonable interpretation of existing law regarding trademark infringement. That being so, Drug Emporium's actions cannot give rise to a claim of tortious interference. *See Union Nat. Bank v. Federal Nat. Mortg. Ass'n,* 860 F.2d 847, 857–58

---

5. The products involved in this case are rather innocuous, such as shampoos and styling gels.

There are no hair coloring or other products that

(8th Cir.1988).[6] Acting in a manner consistent with that permitted by law does not constitute evidence of intent to interfere with Graham Webb's business relationship with Heil. *See id.*

### III. *Conclusion*

For the foregoing reasons, the Court finds that there are no genuine issues of material fact for trial and that Drug Emporium is entitled to judgment as a matter of law.

IT IS THEREFORE ORDERED that Drug Emporium's motion for summary judgment [doc. # 20] be and it hereby is granted. All other motions are moot.

can be said to involve a risk of physical damage to consumers.

---

**6.** In *Union Nat. Bank,* the court rejected a tortious interference claim with respect to the interpretation of a contract, stating "[t]he fact that [the defendant] asserted in good faith what it reasonably believes to be its rights under the agreement does not constitute evidence of an intent to interfere with [plaintiff's] contractual rights or business relations." 860 F.2d at 858–59. The court concluded that because the defendant's actions were supported by a reasonable interpretation of the agreement of the parties, they cannot give rise to a claim of tortious interference. *Id.*