881 F.2d 530
 58 USLW 2162, Bankr. L. Rep. P 73,049
 In re NWFX, INC. (Consolidated), Debtor.
Allen W. BIRD, II, as Trustee for Northwest Financial
Express, Inc., NWFX, Inc., and Gold Financial
Express, Inc., Appellee,
v.
CROWN CONVENIENCE, Derby Refining, et al. (Pyburn
Enterprises, Inc.), Appellants.
 No. 88-2395.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 12, 1989.
Decided Aug. 1, 1989.
 
 Mark A. Colbert, Little Rock, Ark., for appellants.
 Allen W. Bird, II, Little Rock, Ark., for appellee.
 Before FAGG, Circuit Judge, and FLOYD R. GIBSON and TIMBERS*, Senior Circuit Judges.
 FLOYD R. GIBSON, Senior Circuit Judge.
 
 
 1
 Pyburn Enterprises, Inc. (Pyburn) appeals an order of the district court entered pursuant to the proposed findings of fact and conclusions of law submitted by the bankruptcy court which found Pyburn had breached its contract with Northwest Financial Express, Inc. (NWFX) involving the sale of money orders. For the reasons that follow we reverse the order of the district court.
 
 I. BACKGROUND
 
 2
 This case arose after NWFX filed a voluntary chapter 11 bankruptcy petition on August 1, 1986. NWFX is an Arkansas corporation that was engaged in the business of selling money orders nationwide. As a result of its bankruptcy, several cases similar to the present case have been filed. See, e.g., In re NWFX, Inc., 864 F.2d 588 (8th Cir.1988) [hereinafter NWFX I ] and In re NWFX, Inc., 864 F.2d 593 (8th Cir.1989) [hereinafter NWFX II ].
 
 
 3
 NWFX sold its money orders through grocery stores and other retail outlets that acted as its agent. NWFX's arrangement with its agents provided that the stores would sell NWFX money orders to their customers and remit the proceeds from the sales directly to NWFX. Pyburn was one of the grocery store chains selling NWFX money orders. Pyburn has four grocery stores located in Houston, Texas. The arrangement between Pyburn and NWFX, labeled a "Trust Agreement," provided that Pyburn would act as NWFX's agent and sell its money orders.
 
 
 4
 Pyburn was to hold all moneys received from the sale of NWFX money orders in trust for NWFX and on a weekly basis Pyburn was required to prepare a settlement report and remit to NWFX all funds held in trust plus 22 cents per money order sold. In return for selling NWFX's money orders Pyburn was entitled to retain a portion of the fee which was charged to the money order purchaser.
 
 
 5
 On July 25, 1986, the bank through which the NWFX money orders cleared closed NWFX's account and ceased its relationship with NWFX. Upon learning of this, Pyburn became concerned. Rather than remit the proceeds from the sale of money orders to NWFX, Pyburn retained $89,052.88 of the proceeds from the money order sales.
 
 
 6
 NWFX's bankruptcy had a devastating effect on thousands of Texas citizens who purchased NWFX money orders. Most of the money orders were purchased by people with low incomes. The money orders were often purchased to pay bills such as rent and utility expenses. Accordingly, when NWFX money orders were dishonored money order purchasers faced dire consequences. Mr. Pyburn, the owner of Pyburn Enterprises, explained that
 
 
 7
 [M]ost of the people that buy money orders are people that don't have bank accounts. They are people that live from week to week, and they don't have much money, and they cash their paycheck. They have real dollars in their hand, and they exchange those real dollars for a safe form of money to pay their bills with so they'll have receipts.
 
 
 8
 (Tr. 30-32). Because of the tremendous impact NWFX's bankruptcy had on Texas' lower income citizens, Jim Mattox, Attorney General for the State of Texas,[1] made a humanitarian plea to retail store owners engaged in selling NWFX money orders to refund moneys obtained from purchasers of the dishonored NWFX money orders.[2] In response to this plea Pyburn made refunds to its money order customers totalling $70,600.62. Pyburn prepared a release which its customers were required to sign when they received their refund.
 
 
 9
 On August 1, 1986, NWFX filed its bankruptcy petition and on that same day it, as debtor-in-possession, filed an adversary proceeding seeking the turnover of moneys, money orders, and supplies held by the retailers that sold its money orders. A trustee for NWFX's bankruptcy estate was appointed by the bankruptcy court. The trustee amended the adversary proceeding by alleging a breach of contract by Pyburn. The trustee sought damages for Pyburn's alleged breach of contract and prejudgment interest at the rate of 10% per annum. A trial was held before the bankruptcy court which then made recommended findings of fact and conclusions of law.
 
 
 10
 The bankruptcy court recommended to the district court that judgment be entered in NWFX's favor. Specifically the court concluded that Pyburn breached the contract with NWFX and NWFX's damages totalled $89,052.28 (the amount withheld by Pyburn). The $89,052.28 was reduced to $70,600.62 because Pyburn tendered $18,451.66 at trial. The amount tendered at trial represented the funds remaining after Pyburn refunded $70,600.62 to its customers. The bankruptcy court also recommended an award of prejudgment interest at the rate of 6% per annum. The district court adopted the bankruptcy court's recommendations in toto. This appeal followed. We reverse.
 
 II. DISCUSSION
 A. Jurisdiction
 
 11
 The first argument raised by Pyburn challenges the bankruptcy court's jurisdiction to hear this dispute. This assertion does not warrant extended discussion. The bankruptcy court concluded that it had jurisdiction over the complaint pursuant to 28 U.S.C. Sec. 157(c)(1).[3] In In re Dogpatch U.S.A., Inc., 810 F.2d 782, 786 (8th Cir.1987), this court held that "[f]or a proceeding to be 'related to' a bankruptcy case for purposes of bankruptcy jurisdiction, courts require that it 'have some effect on the administration of the debtor's estate.' " (quoting Zweygardt v. Colorado Nat'l Bank, 52 B.R. 229, 233 (Bankr.D.Colo.1985)).
 
 
 12
 We construe this statute broadly in order to effectuate the policies of the bankruptcy code. Cf. In re Daniels-Head & Associates, 819 F.2d 914, 918 (9th Cir.1987) ("concept of relatedness under section 157(c)(1) is a broad one"). We have no trouble concluding that this case is related to NWFX's bankruptcy for purposes of bankruptcy jurisdiction. This action clearly will impact the assets of the bankruptcy estate and the funds available for distribution in the bankruptcy. Accordingly the dispute is within the jurisdiction of the bankruptcy court. See, e.g., Matter of Kubly, 818 F.2d 643, 645 (7th Cir.1987) (" 'related to' jurisdiction encompasses only disputes that affect the payments to the bankrupt's other creditors or the administration of the bankrupt's estate").
 
 B. Merits
 
 13
 We are in a unique position in this case because not only do we have circuit precedent to look to in guiding our decision but we have two cases which originated from the very bankruptcy which spawned the instant appeal. In NWFX I, a panel of this court was faced with a similar problem when a chain of grocery stores refunded proceeds from the sale of NWFX money orders to its customers holding dishonored NWFX money orders. In NWFX I the bankruptcy court held that moneys retained by the seller of NWFX's money orders did not constitute property of NWFX's bankruptcy estate and therefore was not subject to an order of turnover. NWFX I, 864 F.2d at 589.
 
 
 14
 The bankruptcy court reached this conclusion after it determined that there was not a valid contract between NWFX and the grocery store. In the absence of a valid contract NWFX had no legal interest in the proceeds generated from the sale of its money orders, the bankruptcy court concluded. Therefore the proceeds were not property of NWFX's bankruptcy estate.
 
 
 15
 In NWFX I this court reversed that portion of the bankruptcy court's order noting that while NWFX did not have a legal interest in the proceeds in the absence of a valid contract, NWFX did have an equitable interest in the funds based on quasi-contract principles. The panel in NWFX I ordered the grocery store to turn over proceeds from the sale of NWFX money orders that were still in its possession. Id. at 592.
 
 
 16
 On the issue of the refunded proceeds, however, no basis appears upon which such proceeds can be ordered turned over. Because [the retailer] has refunded that amount, it cannot be said to be unjustly enriched. As to the proceeds not yet paid out, they should now be remitted to the estate except to the extent that [the retailer] can clearly establish obligations to make further refunds during the life of the money orders. This is because retention in the absence of refunding unjustly enriches [the retailer], and because the estate apparently has claims against it from the holders of these unredeemed money orders.
 
 
 17
 Id. at 591-92.
 
 
 18
 In contrast, another panel of this court in NWFX II held that moneys refunded by sellers of NWFX money orders to their money order customers were subject to turnover to the NWFX bankruptcy estate and the sellers were not entitled to an equitable set off equal to the amount refunded to their customers. NWFX II, 864 F.2d at 595-96. The panel stated that the seller "was under no obligation to refund any money to buyers of dishonored money orders. On the contrary, refunding such amounts was a breach of its trust agreement." Id. at 596.
 
 
 19
 The panel in NWFX II also rejected the money order seller's argument that the doctrine of recoupment applied and entitled it to retain the proceeds from the money order sales which equaled the amount of the refunds made to its money order customers. The panel held that for the doctrine to apply "the creditor must have a claim against the debtor that arises from the same transaction as the debtor's claim against the creditor." 864 F.2d at 597 (citation omitted). The court rejected the application of the recoupment doctrine on these facts because
 
 
 20
 [the retailer] cannot show that its claim and the claim of the trustee arose from the same transaction. [The retailer] acquired the funds in question from its sales of the debtors' money orders. Its claim against the debtors arose from voluntary refunds made to its own customers. The doctrine of recoupment cannot be applied to give [the retailer] a preference over the other creditors in this bankruptcy.
 
 
 21
 Id.
 
 
 22
 In dissent from the panel opinion in NWFX I, Senior Judge Sneed of the Ninth Circuit, sitting by designation, explained how he would handle the issue of the refunds made by the money order sellers.
 
 
 23
 The record in this case does not suggest that Rice [, the money order seller,] had an obligation to refund its customers. It was not a guarantor of the money orders it sold. Holders of Northwest's money orders have claims against Northwest, not Rice. Rice therefore should have turned over to Northwest all of the proceeds from its money order sales. Its decision not to do so kept its customers happy and maintained its good will at no cost to it. Northwest's creditors, other than Rice's customers, provided the funds by which Rice enhanced its reputation. Rice's customers have received payment in full on their claims against Northwest while all other creditors of Northwest will not.
 
 
 24
 * * * The majority holds that a party is unjustly enriched, not to the extent it has received money, but to the extent the money received has not been dissipated. * * *
 
 
 25
 My result would not impose on Rice a double liability, one to its customers and another to Northwest. Although the issue is not before the court, Rice, after reimbursing its customers, could assert their claims against Northwest. Rice could argue either that the customers assigned to Rice their money order claims or that Rice acquired the customer's claims under a theory of equitable subrogation. To the extent that Rice would not receive full payment on these claims in the bankruptcy court at distribution, to that extent it would have paid for the maintenance of its goodwill. Moreover, it would have paid for it with its own money.
 
 
 26
 864 F.2d at 592 (citation omitted).
 
 
 27
 We have carefully reviewed the panel opinions in NWFX I and NWFX II and we conclude that there are no significant factual differences which would justify the different conclusions reached in these two cases. Yet, our reading of the two panel opinions leaves us with the inescapable conclusion that the opinions are not consistent with one another. NWFX I does not require the money order sellers to turn over the amount of the refunds made to money order purchasers while NWFX II does.
 
 
 28
 While the decision in NWFX I was premised on a finding that there was no contract between NWFX and its money order seller, the panel nevertheless concluded that NWFX had an equitable interest in moneys retained by the money order seller. Once that conclusion is reached, we do not think there is any way to distinguish NWFX I from NWFX II.
 
 
 29
 Therefore we are confronted with what we perceive are two conflicting cases either one of which, in the absence of the other, would be controlling precedent in the instant case.
 
 
 30
 The inconsistency in these cases seems to have its origin in the bankruptcy court. In NWFX I the bankruptcy court held that moneys retained by the money order seller were not property of NWFX's bankruptcy estate. However, the same bankruptcy judge in NWFX II held that proceeds retained by a money order seller was property of the bankruptcy estate. In NWFX II, the bankruptcy court fashioned an equitable remedy which allowed the money order seller to set off the amounts that it refunded to money order purchasers against amounts it owed to the bankruptcy estate. The bankruptcy court in the NWFX II appeal held that money collected from the sale of NWFX money orders and held by the money order sellers "could be used as 'equitable setoffs' against post-petition sums paid by [the retailers] from their own funds to their customers who had purchased money orders that were ultimately dishonored." 864 F.2d at 594.
 
 
 31
 Then, in the instant case, the same bankruptcy court again concluded that proceeds held by the money order seller were property of the bankruptcy estate. The court, however, did not allow the money order seller to set off the moneys that it refunded to its customers. All of these holdings in the three cases were affirmed by the same district judge.
 
 
 32
 Absent an en banc hearing to determine the matter, we conclude that the reasoning in NWFX I should be employed to resolve the instant appeal. In the instant case the bankruptcy court noted that the NWFX-Pyburn agreement does not indicate whether Arkansas or Texas law should be applied to interpret the agreement. In this respect the agreement between NWFX and Pyburn differed from the November 1984 agreement that NWFX had with Rice Food Markets which was at issue in NWFX I. The bankruptcy court relied primarily on Arkansas law in its decision. However, it also concluded that the result it reached would be the same whether Arkansas or Texas law were applied. We believe that under the applicable choice of law principles Texas law should be applied in interpreting the NWFX-Pyburn agreement. The parties' repeated reference to Arkansas law in their briefs suggests that they assume that Arkansas law controls the interpretation of the NWFX-Pyburn agreement. We believe this is an erroneous assumption.
 
 
 33
 In Union Nat'l Bank v. Federal Nat'l Mortg. Ass'n, 860 F.2d 847, 853 n. 13 (8th Cir.1988), this court noted that when deciding the choice of applicable state law district courts are obligated to apply the choice of law principles of the state in which they sit. The court continued: "Therefore, Arkansas choice of law principles apply. Since the agreement of the parties did not specify the law to be applied, a 'significant contacts' or 'center of gravity' test is appropriate." Id. (citations omitted).
 
 
 34
 In Aetna Life Ins. Co. v. Great Nat'l Corp., 818 F.2d 19 (8th Cir.1987), this court was required to determine whether Arkansas or Texas law governed a loan agreement. We noted that
 
 
 35
 Arkansas has applied three different theories in determining what law governs a multi-state contract: (1) the law of the state in which the contract was made; (2) the law of the state in which the contract is to be performed; and (3) the law of the state which the parties have intended to govern the contract.
 
 
 36
 Id. at 20 (citing Cooper v. Cherokee Village Development Co., 236 Ark. 37, 364 S.W.2d 158, 161-62 (1963)).
 
 
 37
 We believe that under Arkansas choice of law principles Texas law should be applied to the NWFX-Pyburn agreement. The agreement between NWFX and Pyburn was executed and performed in Texas. Furthermore, the state of Texas has a substantial interest in this dispute as evidenced by the filing of an amicus curiae brief by the Texas Attorney General.[4]
 
 
 38
 The bankruptcy court concluded that NWFX was not in breach of the contract when its money orders were dishonored. We believe that this conclusion was erroneous. The agreement between NWFX and Pyburn established an agency relationship between them wherein NWFX was the principal and Pyburn was its agent. Therefore, in the absence of specific provisions in the agreement, we look to general agency principles to define the extent of the relationship between NWFX and Pyburn.
 
 
 39
 The comments to section 442 of the Restatement of the Law of Agency provide that "a failure of the principal to continue the employment because of his bankruptcy is ordinarily a breach of contract." Restatement (Second) of Agency Sec. 442 comment e (1958), see also Restatement (Second) of Agency Sec. 450 comment b (bankruptcy of the principal, whether or not voluntary, is a breach of contract if it renders performance impossible).
 
 
 40
 In addition, section 437 of the Restatement of the Law of Agency provides:
 
 
 41
 Unless otherwise agreed, a principal who has contracted to employ an agent has a duty to conduct himself so as not to harm the agent's reputation nor to make it impossible for the agent, consistently with his reasonable self-respect or personal safety, to continue in the employment.
 
 
 42
 Restatement (Second) of Agency Sec. 437 (1958).
 
 
 43
 The comments to this section state that "the agent is justified in assuming that the principal has and will maintain for himself and his business a standard of conduct which will not harm the agent's reputation or reasonable self-respect if he continues to act as agent." Id. comment a. Furthermore, "[a]n agent employed by a seemingly reputable principal has no duty to continue to act as agent if he subsequently learns that the principal's business is fraudulent or otherwise unlawful, as where a teller in a bank learns that the bank is violating the statutes passed for the protection of depositors." Id. comment b. The Restatement also comments that "[s]eriously improper conduct by the principal, whether or not tortious, towards an agent employed by him under contract is a breach of contract." Id. comment d.
 
 
 44
 In the instant case NWFX breached its agreement with Pyburn when it became insolvent and filed for bankruptcy. Furthermore, although the trustee for NWFX did not desire to get into the details of NWFX's conduct, there appears to be some indication that NWFX was involved in fraudulent activity. NWFX's bankruptcy was hastened by an order of the Arkansas Securities Commission which suspended NWFX's license to do business in Arkansas.[5] Shortly thereafter, the bank through which NWFX's money orders cleared ceased its business relationship with NWFX and then closed its account. Thus, NWFX's bankruptcy rendered performance under the NWFX-Pyburn agreement impossible and constituted a breach. Pyburn was also relieved of its obligation to act as NWFX's agent when it heard that NWFX may have been involved in fraudulent activity. The dishonor of the NWFX money orders caused considerable harm to Pyburn's reputation and the goodwill it enjoyed with its customers. NWFX's bankruptcy and improper conduct made it impossible for Pyburn to continue to act as its agent.
 
 
 45
 Moreover, the statements made by NWFX to Pyburn that money order sales should be discontinued and its subsequent conduct may have established an anticipatory breach by NWFX. See, e.g., Restatement (Second) of Agency Sec. 450 comment c.
 
 
 46
 We also believe that when NWFX's money orders were dishonored NWFX breached an implied covenant of good faith which is inherent in the NWFX-Pyburn contract. While the Texas Supreme Court has rejected the theory that all contracts embody an implied covenant of good faith and fair dealing, see English v. Fischer, 660 S.W.2d 521, 522 (Tex.1983), such a covenant has been implied when certain special relationships exist. One such relationship "arises from the element of trust necessary to accomplish the goals of the undertaking * * * * " Id. at 524 (Justice Spears, concurring). We believe that the relationship of principal and agent which existed between NWFX and Pyburn embodied the element of trust which would carry with it an obligation of good faith and fair dealing. See, e.g., Kinzbach Tool Co., Inc. v. Corbett-Wallace Corporation, 138 Tex. 565, 160 S.W.2d 509, 514 (1942) (good faith and fair dealing required from agent in every transaction on behalf of principal). We believe the element of trust requirement is also satisfied because NWFX was operating in a business heavily regulated by the State of Texas. NWFX was a licensee under the provisions of the Texas Sale of Checks Act, Tex.Rev.Civ.Stat.Ann. art. 489d et seq. (Vernon 1985).[6] Thus, we conclude that when NWFX's money orders were dishonored, NWFX breached an implied covenant of good faith and fair dealing implicit in its contract with Pyburn.
 
 
 47
 Furthermore, we believe that the contract between Pyburn and NWFX would be void as against public policy if it were interpreted to allow NWFX to issue money orders without a corresponding obligation to honor those money orders when they are presented for payment. See, e.g., English v. Fischer, 660 S.W.2d at 525 (Justice Spears, concurring) ("In situations where the duty of good faith and fair dealing does exist, public policy would dictate that it cannot be disclaimed."). Under Texas law, as in most other jurisdictions, contracts which are contrary to public policy are void. "Expressions of public policy are found in a state's constitution, statutes and judicial decisions." Locomotive Eng'rs & Conductors Mut. Protective Ass'n v. Bush, 576 S.W.2d 887, 890 (Tex.Civ.App.1979) (citations omitted). An agreement that allowed NWFX to issue money orders without any obligation to honor them would be inconsistent with NWFX's obligations as a licensee under the Texas Sale of Checks Act which provides that "[e]ach licensee shall be liable for the payment of all checks which he sells, in whatever form and whether directly or through an agent * * * * " Tex.Rev.Civ.Stat.Ann. art. 489d, Sec. 12.
 
 
 48
 Therefore, we disagree with the bankruptcy court's conclusion that NWFX was not in breach of its contract with Pyburn. NWFX's breach of the contract with Pyburn was a material breach that discharged Pyburn from its obligation to perform. Mead v. Johnson Group, Inc., 615 S.W.2d 685, 689 (Tex.1981) ("Default by one party excuses performance by the other party."). Thus, Pyburn was entitled to take all actions necessary to minimize the adverse consequences of NWFX's breach. Once again we look to general principles of agency law to determine the appropriateness of Pyburn's actions.
 
 
 49
 Section 439 of the Restatement of the Law of Agency provides:
 
 
 50
 Unless otherwise agreed, a principal is subject to a duty to exonerate an agent who is not barred by the illegality of his conduct to indemnify him for:
 
 
 51
 * * *
 
 
 52
 * * *
 
 
 53
 (e) payments resulting in benefit to the principal, made by the agent under such circumstances that it would be inequitable for indemnity not to be made.
 
 
 54
 Restatement (Second) of Agency Sec. 439.
 
 
 55
 In addition, if an agent "acts in good faith, mistakenly believing that he is authorized or that his principal's interests require his action, he may be entitled to indemnity to the extent that the principal has benefited, in accordance with the principles of restitution." Id. comment i.
 
 
 56
 Thus, in the instant case because Pyburn made refunds to money order purchasers in good faith and for the benefit of its principal, NWFX, it would be entitled to indemnity from NWFX for the refunds.[7] Accordingly, we hold that the moneys refunded by Pyburn were not property of NWFX's estate and not subject to turnover.
 
 
 57
 Our conclusion is consistent with the panel opinion in NWFX I which applied principles of restitution and unjust enrichment to conclude that refunds made to purchasers of money orders under circumstances similar to those in the case at bar were not subject to turnover to the bankruptcy estate. Similarly, the NWFX I panel held that moneys retained by the money order seller after it made refunds to its customers were subject to turnover to the bankruptcy estate.
 
 
 58
 In sum, the only interest, as defined by state law, that NWFX had in the moneys held by Pyburn was an equitable interest in the $18,451.66 which was the amount held by Pyburn from the sale of money orders remaining after it made refunds to money order purchasers. Therefore, this amount was properly turned over to the bankruptcy trustee.
 
 
 59
 Accordingly, we hold that the $18,451.66 which Pyburn tendered at the commencement of the trial before the bankruptcy court was properly subject to turnover to the bankruptcy estate. These funds represented proceeds from the sale of NWFX's money orders which were not returned to purchasers of the money orders. However, we do not agree that the proceeds from the sale of NWFX money orders which were ultimately refunded to holders of dishonored money orders were properly subject to the bankruptcy court's turnover order.
 
 III. CONCLUSION
 
 60
 We conclude that the proceeds from the sale of NWFX money orders which were refunded to purchasers of dishonored money orders were not subject to turnover to NWFX's bankruptcy estate. Accordingly, we affirm in part and reverse in part the order of the district court and remand this matter to the district court for further proceedings consistent with this opinion.
 
 
 
 *
 The HONORABLE WILLIAM H. TIMBERS, Senior United States Circuit Judge for the Second Circuit Court of Appeals, sitting by designation
 
 
 [1]
 The State of Texas filed an amicus curiae brief in support of Pyburn's legal arguments
 
 
 [2]
 In a newspaper article appearing in the Houston Chronicle it was reported:
 State Attorney General Jim Mattox is urging supermarkets and other stores that sold money orders from a failed Arkansas company to make refunds.
 When Northwest Financial Express filed for bankruptcy last week, it left Texas consumers holding between $5 million and $6 million in worthless money orders in "one of the most widespread consumer rip-offs we've seen in Texas in a long time," said Mattox.
 Hous.Chron., Aug. 14, 1986, Sec. 2, at 1, col. 3.
 
 
 [3]
 28 U.S.C. Sec. 157(c)(1) (Supp. V 1987) provides:
 A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11. In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected.
 
 
 [4]
 Texas' strong interest in this dispute and its subject matter is also illustrated by the fact that just three weeks after NWFX filed its bankruptcy petition a bill was introduced in the Texas House of Representatives to amend the Texas Sale of Checks Act. See Texas Sale of Checks Act: Hearings on H.B. 64 Before the Committee on Financial Institutions, 69th Leg., 2nd C.S. (Aug. 26, 1986) (statement of Rep. Granoff). The amendment was a direct and immediate response to the NWFX bankruptcy which left thousands of Texas citizens holding "hot" money orders. H.B. 64, House Debate and second and third reading of H.B. 64, 69th Leg., 2nd C.S. (Sept. 1, 1986) (statement of Rep. Granoff). The amendments when finally passed provided, among other things, that
 Agents of licensees shall hold in trust from the moment of receipt the proceeds of a sale or delivery of the licensee's checks. An agent may not commingle the proceeds with his own property or funds, except to use the funds in the ordinary course of its business for the purpose of making change. If any agent of a licensee commingles any proceeds received from the sale of checks issued by the licensee with any other funds or property owned or controlled by the agent, all commingled proceeds and other property shall be impressed with a trust in favor of the licensee in an amount equal to the amount of the proceeds due the licensee from the sale of checks less the amount due the agent from the sale. In the event that a licensee's license is revoked by the Commissioner pursuant to Section 14, all sales proceeds then held in trust by agents of that licensee shall be deemed to have been assigned to the Commissioner.
 
 
 [5]
 There is also reason to believe that NWFX may have been in violation of the Texas Sale of Checks Act because its license to do business under the Act was revoked shortly after the NWFX money orders were dishonored
 
 
 [6]
 The Texas Sale of Checks Act requires licensees to have a minimum net worth and to establish their financial responsibility, business experience, character, and general fitness so as to warrant the belief that the licensee's business will be conducted honestly, carefully, and efficiently. Tex.Rev.Civ.Stat.Ann. art. 489d, Sec. 5. Licensees are also required to post a bond with a state agency. Id. at Sec. 9
 
 
 [7]
 Pyburn's good faith is best illustrated by the fact that it prepared a release for its benefit and the benefit of NWFX which purchasers of money orders were required to execute before receiving a refund